IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

```
- - - - - - - - - - - - - - x
                            :
In the Matter of:           :
                            :
UNITED STATES OF AMERICA     :
                            :
        vs.                 :  Docket No. 08-0255M-01(CR)
                            :
LARRY A. BRINSON-SCOTT       :  Washington, D.C.
                            :  April 16, 2008
- - - - - - - - - - - - - - x
```

TRANSCRIPT OF PRELIMINARY HEARING
BEFORE THE HONORABLE DEBORAH A. ROBINSON
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

On behalf of the Government:

ANGELA S. GEORGE, Esq.
Assistant United States Attorney

On behalf of the Defendant:

RITA BOSWORTH, Esq.
Federal Public Defender Service

Proceedings recorded by the Court, transcript produced by
Pro-Typists, Inc., 1012-14th Street, N.W., Suite 307,
Washington, D.C. 20005, 202-347-5395, www.pro-typists.com
M2523/dac

# C O N T E N T S

| Government Witness | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| Michael Kasco | 8 | 25 | 38 | — |

1              <u>P R O C E E D I N G S</u>

2              THE CLERK:  Angela George for the Government,

3    Rita Bosworth for Mr. Scott.  This is here for a

4    preliminary hearing, slash, detention hearing.

5              THE MAGISTRATE JUDGE:  Now good afternoon.  Ms.

6    George, is the United States ready to proceed?

7              MS. GEORGE:  Yes, Your Honor.

8              THE MAGISTRATE JUDGE:  Ms. Bosworth, are you

9    ready on behalf of Mr. Brinson-Scott?

10             MS. BOSWORTH:  Yes, Your Honor.

11             THE MAGISTRATE JUDGE:  Very well, Ms. George, you

12   may ask your witness to step forward and be sworn.

13             MS. GEORGE:  Your Honor, the Government calls

14   Officer Kasco to the stand.

15             THE MAGISTRATE JUDGE:  Now good afternoon.

16             MR. KASCO:  Good afternoon, Your Honor.

17             THE MAGISTRATE JUDGE:  I'll ask you to please

18   face the deputy clerk to be sworn.

19             **MICHAEL KASCO, GOVERNMENT'S WITNESS, SWORN**

20             THE MAGISTRATE JUDGE:  Good afternoon.  You may

21   proceed, Ms. George.

22             THE WITNESS:  Thank you, Ma'am.

23             MS. GEORGE:  Your Honor, the Government would

24   like the record to reflect that it provided Defense

25   Counsel Bosworth with the following documents, a two-page

1    PD-163, as well as a Gerstein, a Superior Court Gerstein,

2    and in addition to that, the Government provided a search

3    warrant, an affidavit in support of a search warrant, as

4    well as the search warrant return, which has not been

5    returned yet.

6           And I'd like for the record to reflect that Ms.

7    Bosworth has brought to the Government's attention that

8    the search warrant, the affidavit in support of the search

9    warrant application, it appears to be missing Page 3.  I

10   was not aware of that until she brought it to my

11   attention, as I did not receive that information until

12   approximately like an hour and a half ago.  But I've

13   indicated to her that once I receive that Page 3, I will

14   turn it over to her.  And I've spoken with the officer, he

15   does not have Page -- he does not have Page 3 with him.

16          THE MAGISTRATE JUDGE:  Am I correct that the

17   warrant is a Superior Court warrant?

18          MS. GEORGE:  That is correct, Your Honor, and

19   there's actually a -- it is a firearms warrant, it is not

20   a drug warrant.  This is a, of course the Court knows, a

21   possession with intent to distribute crack cocaine case.

22   So I've provided it to defense counsel as contextual

23   information.  I mean it is the warrant that led to the

24   arrest, but the initial warrant was not for drugs, it was

25   for a gun.

1          THE MAGISTRATE JUDGE:  Thank you, Ms. George.

2    Ms. Bosworth, are you ready to proceed at this time or do

3    you wish to wait until the additional page is available?

4          MS. BOSWORTH:  Your Honor, we can proceed, but

5    I'd like to reserve the right to revisit the preliminary

6    hearing once I get the page if there's anything in there

7    that I feel I need to address.

8          THE MAGISTRATE JUDGE:  Very well, thank you.  You

9    may inquire, Ms. George.

10          MS. GEORGE:  And Your Honor, not to prolong the

11   hearing, but I did speak with the officer briefly and he

12   indicated at that time, almost before the case was called,

13   that the search warrant is actually only three pages.  And

14   I'm just doing this so that the record is full.

15          And in response to that, I looked at the search

16   warrant and stated to the officer that it appeared that

17   the first page that flows over to the second page didn't

18   flow correctly and it appeared that the page was missing,

19   but he has nodded that the search warrant is only three

20   pages.  So there may not actually be a third page, but I

21   don't know that at this time.  I don't know if the Court

22   wants to give me a pass to ascertain that, because at this

23   point, Ms. Bosworth is expecting to receive a third page.

24    I don't even know if a third page exists at this point in

25   time.

1          THE MAGISTRATE JUDGE:  Why don't we take a brief

2     recess, then, so you can confer.  When I say "you," both

3     of you confer with Officer Kasco, since I imagine this

4     issue will be the subject of either the examination by

5     you, Ms. George, or your cross, Ms. Bosworth.  And if

6     we're simply missing material and can't have a meaningful

7     examination at this time, then I imagine you may wish to

8     wait.

9          MS. GEORGE:  That's fine, Your Honor, we can do

10    that quickly.

11         THE MAGISTRATE JUDGE:  It is my understanding

12    that Superior Court is closed today, so there's nothing

13    available in the Clerk's Office across the street today.

14    I don't know whether that is the only place the document

15    is or not.  But why don't you take a few moments and

16    discuss this so when we do get started, the examination

17    will proceed in an orderly fashion.

18         THE MAGISTRATE JUDGE:  Very well, let's take five

19    minutes.  You may step down.  Thank you.

20         THE CLERK:  All rise.  This Honorable Court

21    stands in recess.

22         (Whereupon, a recess is taken from 2:00 p.m. to

23    2:11 p.m.)

24         THE CLERK:  We're back on the record in the

25    United States versus Larry Brinson-Scott.

1           THE MAGISTRATE JUDGE:  Ms. Bosworth, what did you

2     decide?

3           MS. BOSWORTH:  Your Honor, Ms. George spoke with

4     the officer and she related to me that he told her that

5     even though the warrant says there's four pages, there's

6     actually only three pages and that there is not a third

7     page.  I obviously have no evidence to refute this.

8           I would say for the record that the fact that it

9     was misnumbered, I could maybe see that, but there's also

10    a sentence on the first page of the warrant that is cut

11    off and then not continued on the following page.  It

12    seems a little too coincidental to me that there's a

13    missing page, not really a missing page, given this, that

14    it's out of context and that it's misnumbered.  But I

15    obviously have no evidence refute that, given that we get

16    all of the documents from the Government.

17          So at this point, I would note that for the

18    record, but submit that we should proceed with the

19    hearing.

20          THE MAGISTRATE JUDGE:  Very well, I'm leaving

21    that entirely up to you.  We will proceed if that is what

22    you wish to do.  If you prefer to wait until you have an

23    opportunity to get the materials, obtain the materials

24    that are available in the Superior Court Clerk's Office,

25    then we'll set another date.

1          MS. BOSWORTH:  No, Your Honor, we would proceed

2     today.

3          THE MAGISTRATE JUDGE:  Very well, thank you.  And

4     may I assume that you are still ready to proceed today --

5          MS. GEORGE:  Yes, Your Honor.

6          THE MAGISTRATE JUDGE:  -- Ms. George?

7          MS. GEORGE:  And I'd just like to state for the

8     record that I also told Ms. Bosworth after talking with

9     the officer that on the first page, the hanging sentence

10    that she refers to, the officer indicated that he prepared

11    the warrant and that basically was a typo.  He should have

12    deleted that incomplete sentence there and that is why he

13    is concluding that the -- and in fact, stating that the

14    warrant, the affidavit in support of the search warrant

15    application is only three pages and that there is no

16    missing third page.

17         THE MAGISTRATE JUDGE:  Very well.  Agent Kasco,

18    I'll ask you to return, please.  Thank you.

19         THE WITNESS:  Thank you, Your Honor.

20         THE MAGISTRATE JUDGE:  Now Ms. George, you may

21    proceed.

22         MS. GEORGE:  Thank you, Your Honor.

23                    **DIRECT EXAMINATION**

24    BY MS. GEORGE:

25    Q    Sir, could you please state your full name for the

1    record, spelling your first and your last name?

2    A    Yes, Officer Michael Kasco.  The first name is

3    spelled M-i-c-h-a-e-l, my last name is spelled K-a-s-c-o.

4    Q    Officer Kasco, where do you work?

5    A    I work for the Metropolitan Police Department,

6    assigned to the First District.

7    Q    Are you a law enforcement officer with that agency?

8    A    Yes, Ma'am.

9    Q    And how long have you been a police officer with the

10   Metropolitan Police Department?

11   A    I've been a member since 2004.

12   Q    And where are you currently assigned?

13   A    I'm currently assigned to the Crime Response Team,

14   CRT.

15   Q    And could you briefly explain your duties to the

16   Court?

17   A    My current position, I'm in -- throughout the First

18   District, we're having a high bit of robberies and thefts.

19    I'm currently assigned to that unit.

20   Q    And Officer Kasco, do you have any experience with

21   MPD where you've dealt with narcotics cases?

22   A    Yes.

23   Q    Could you please describe that experience for the

24   Court?

25   A    My previous units include I was assigned to 1D Vice,

1    I was also assigned to 1D Street Crimes.

2    Q    And as a member of those two units, could you please

3    tell the Court what your duties were?

4    A    Basically in 1D Vice, you were sent out daily,

5    setting up OPs, conducting street RIPs, conducting buy-

6    bust operations.

7    Q    And are those activities that you just described, are

8    they narcotics investigative activities?

9    A    All narcotics.

10   Q    And could you please briefly describe your duties

11   with regard to the Street Crimes Unit?

12   A    Yes.  Street Crimes, basically we were assigned by

13   the commander to go to hot spot areas that are high in

14   drugs, high in crime, high in gun violence.  Anywhere that

15   was a hot spot with in the First District, we were

16   assigned there to saturate the area, either conduct jump-

17   outs or whatever operations.

18   Q    And is a jump-out a narcotics type of investigative

19   activity?

20   A    Yes, Ma'am.

21   Q    And in your experience as an officer in those units

22   and just in your tenure as a police officer in general,

23   could you please tell the Court whether or not you've

24   worked on cases that have involved a narcotic cocaine

25   base, also known as crack cocaine?

1   A    Yes.

2   Q    Could you please estimate for the Court how many

3   cases that you have been involved in?

4   A    At least 50.

5   Q    And in those 50 cases, did you become familiar with

6   the price for which crack cocaine sold on the streets of

7   the District of Columbia?

8   A    Yes.

9   Q    Did you become familiar with the manner in which it

10  was distributed on the streets of the District of

11  Columbia?

12  A    Yes.

13  Q    And did you become familiar with how crack cocaine is

14  packaged for distribution on the streets of the District

15  of Columbia?

16  A    Yes.

17  Q    Officer Kasco, I'd like to draw your attention to

18  April 10th, 2008, at approximately 3:00 p.m. in the

19  afternoon.  Were you working on that day and at that time?

20  A    Yes.

21  Q    Did you have the opportunity to execute a firearms

22  search warrant at 3411 A, as in apple, Street, Apartment

23  203, Southeast, Washington, D.C.?

24  A    Yes, Ma'am.

25  Q    Were you by yourself or were you with other law

1    enforcement officers?

2    A    At that time, we were comprised of the entire Street

3    Crime CRT Unit.

4    Q    And approximately how many officers does that

5    include?

6    A    Roughly, 12 to 14.

7    Q    And could you please tell the Court what was your

8    role in the execution of the search warrant?

9    A    I actually obtained the search warrant, I also was

10   part of the entry team and I also was the seizing officer.

11            MS. GEORGE:  The Court's indulgence?

12   BY MS. GEORGE:  (Resuming)

13   Q    When you and the other officers entered the

14   apartment, could you please tell the Court how many people

15   were inside the apartment?

16   A    One individual.

17   Q    And do you see that person in court today?

18   A    I do.

19   Q    Could you please point where that person is, describe

20   where that person is seated and describe an article of

21   clothing that person is wearing?

22   A    He is seated to my left in the orange piece of

23   clothing, jump suit.

24   Q    What color was that did you say?

25   A    Orange.

1    MS. GEORGE:  Your Honor, could the record reflect

2    that Officer Kasco has made an in-court identification of

3    Defendant Larry Brinson-Scott?

4    THE MAGISTRATE JUDGE:  Ms. Bosworth, is there any

5    objection to the in-court identification?

6    MS. BOSWORTH:  No, Your Honor.

7    THE MAGISTRATE JUDGE:  The record will reflect

8    the identification.

9    BY MS. GEORGE:  (Resuming)

10   Q    Officer Kasco, could you please give the Court some

11   sense of the layout of the apartment, where the rooms

12   were, furniture, and any additional items?

13   A    Basically, as you made entry into the apartment, you

14   came into the living area, which would be the living room,

15   off to your right would be your kitchen.  You go straight

16   down the hallway, it was a two-bedroom apartment, one

17   bedroom to the left, you have a bathroom in the middle,

18   then a bedroom to your right.

19   Q    Okay, when you say the bathroom is in the middle, is

20   the bathroom in between the bedroom to the left and the

21   bedroom to the right?

22   A    Yes.

23   Q    And during the execution of the search warrant, did

24   you assign any identifiers to the bedrooms?

25   A    Usually, we marked the bedrooms with a marker.

1    Q    And what identifiers did you give the bedrooms in

2    this apartment?

3    A    Basically, wherever we start a search, we'll make

4    that Bedroom 1.

5    Q    Which bedroom in this apartment was Bedroom Number 1?

6    A    The one that Mr. Scott slept in was Bedroom 1.

7    Q    Previously, you described a bedroom on the left and

8    on the right.  Which bedroom is Bedroom Number 1, the one

9    on the left or the one on the right?

10    A    The bedroom on the left.

11    Q    And did you also mark the bedroom on the right as

12    Bedroom Number 2 or did you use some other identifier?

13    A    That should have been marked as Bedroom Number 2.

14    Q    Where was Defendant Scott when you entered the

15    apartment?

16    A    He was sitting in the living room.

17    Q    And what, if anything, was he doing at that time?

18    A    I believe he was just there.  When my sergeant went

19    to make the knock and announce, the Defendant is the one

20    who opened the door.

21    Q    So after he opened the door, did he take a seat in

22    the living room?

23    A    Yes, he was detained in the living room.

24    Q    Could you please tell the Court what, if anything,

25    what, if any, contraband was found in the living room?

1    A    There was contraband found in the living room.

2    Actually, the seat that Mr. Scott was facing, which was

3    directly facing down the hallway, when it was overturned,

4    it was searched by officers and recovered from inside the

5    seat was approximately 183 grams of crack cocaine.

6    Q    And was any portion of that narcotic, alleged

7    narcotics, field-tested?

8    A    Yes, it was.

9    Q    What was the result of it?

10   A    It had a positive reaction to cocaine base.

11   Q    And could you please describe for the Court how it

12   was packaged?

13   A    It was in chunks, big chunks, in a clear ziploc bag.

14        MS. GEORGE:  The Court's indulgence?

15   BY MS. GEORGE:  (Resuming)

16   Q    Were there any other items recovered from the living

17   room?

18   A    Yes, also recovered from the living room was two

19   plates, which had a hard, white residue on them.  A

20   portion of that was field-tested and also testified

21   positive for cocaine base.

22   Q    And where were those plates in relationship to the

23   crack cocaine that was recovered from underneath the seat

24   of the chair?

25   A    When you made entry into the house, you had a chair

1   to your right, a couch to the left, and you had a TV to

2   your right and it was near the TV, towards the kitchen.

3   Q    Were there any documents in the living room?

4   A    Yes, there was.  Officer Steen observed some D.C.

5   Superior Court work I believe for a plea agreement between

6   the D.C. Superior Court and the Defendant, Mr. Scott.  And

7   also, up near the TV was some mail matter through Verizon

8   that had the Defendant's name on it and address.

9   Q    And the address that was on the Verizon mail matter,

10  was it the same or different from the search warrant

11  location?

12  A    The same address.

13  Q    And did the D.C. Superior Court documentation have

14  any information on it with regard to what it was in

15  relationship to?

16  A    Yes, Ma'am, I believe it was a plea agreement between

17  D.C. Superior and Mr. Scott for the charge of attempted

18  PWID cocaine.

19  Q    Was anything else recovered in the living room?

20  A    No, Ma'am.

21  Q    Did you search Bedroom Number 1?

22  A    Yes, Ma'am, it was searched.

23  Q    Please tell the Court what, if any, items or

24  contraband was recovered from Bedroom Number 1.

25  A    Inside a black coat hanging in the closet, inside a

1    glove was four bags of a white powdered substance, which

2    later field-tested positive for cocaine base.

3    Q    And what was the approximate weight of that alleged

4    narcotic?

5    A    Approximately 67 grams.

6    Q    And did each of the clear bags have some of the white

7    powdered substance in them?

8    A    Yes, Ma'am.

9    Q    And could you please give the Court some sense of the

10   dimensions of the white clear plastic bags?

11   A    There were two larger white bags, like ziploc bags,

12   and there was two smaller ones.

13   Q    Okay, I understand that they were large and small,

14   but could you give an estimate of the dimensions of the

15   large bags and then the small bags?

16   A    No, they were just powdered together, then tie

17   wrapped or kind of knotted, so it was just a ball.

18   Q    Were there any documents found in Bedroom Number 1?

19   A    Yes, there was.

20   Q    Could you please describe those documents and tell

21   the Court where they were found?

22   A    I believe we obtained two pieces of documentation

23   having the Defendant's name and that address.

24   Q    And what were these documents?

25   A    I believe it may have been a moving violation and a

1   certificate, title.

2   Q    And where were they recovered from?  I mean I

3   understand they were in the bedroom, but where in the

4   bedroom were they recovered from?

5   A    I believe they were next to the bed, on the floor.

6   Q    Was anything else recovered from Bedroom Number 1?

7   A    No, Ma'am.

8   Q    Before we move to Bedroom Number 2, could you please

9   tell the Court what, if anything, was asked of the

10   Defendant when the officers entered the apartment when he

11   was seated in the chair?

12   A    I believe while he was being detained in the living

13   room, he made gestures to a couple of the officers.  They

14   asked him what bedroom was his, at which point as the

15   Defendant's sitting in the chair, facing down the hallway,

16   he indicated by head movement that his bedroom was on the

17   left.  But a brief time period later, he stated that he

18   slept on the right.

19   Q    Okay, and when you say he indicated by head movement,

20   could you either show the Court or explain to the Court

21   what the officer said the Defendant did?

22   A    Basically, he made a nod notion to the left that his

23   bedroom was to the left.

24        MS. GEORGE:  And for the record, Officer Kasco

25   tilted his head to the left, moving his left ear towards

1    his left shoulder approximately two times.

2    BY MS. GEORGE:   (Resuming)

3    Q    Is that what was described to you by the other

4    officers?

5    A    Yes, Ma'am.

6    Q    Was Bedroom Number 2 searched?

7    A    Yes, it was.

8    Q    What, if anything, was found in Bedroom Number 2?

9    A    U.S. currency and also a breathing mask.

10   Q    Could you please tell the Court how much money was

11   recovered from Bedroom Number 2?

12   A    $2,512.00 in U.S. currency.

13   Q    And where was it recovered from?

14   A    Out a suit coat pocket.

15   Q    Now briefly going back to Bedroom Number 1, you said

16   that the narcotics was recovered from a black coat, is

17   that correct?

18   A    Yes, Ma'am.

19   Q    Could you or any other officers determine whether it

20   was female or male clothing, that coat?

21   A    It was a male.  I believe it was either -- they

22   looked at the size and was either a 3X or a 4X coat.

23   Q    And was there any clothing in Bedroom Number 1 that

24   could have been identified as female clothing?

25   A    No.

1    Q    Now moving back to Bedroom Number 2, you said that

2    the money was recovered from a suit jacket.  What type of

3    clothing was the suit jacket?

4    A    I believe it was a 54 regular.

5    Q    And was that a male suit or a female suit?

6    A    It's a male suit.

7    Q    And was there any clothing in Bedroom Number 2 that

8    could have been identified as female clothing?

9    A    No, Ma'am.

10    Q    Was there any children's clothing in the apartment or

11    anywhere in the apartment, in the bedrooms or anywhere in

12    the apartment?

13    A    No, Ma'am.

14    Q    Other than the mask and the money, was there anything

15    else recovered from Bedroom Number 2?

16    A    No, Ma'am.

17    Q    Were there any closets in the apartment?

18    A    Yes, there was.

19    Q    Could you please describe where those closets were?

20    A    There was one in the hallway.

21    Q    And was there anything recovered from the closet?

22    A    Yes.  Out of I believe a blue gym bag, there were

23    some empty ziplocs and also a photo of him and his

24    brother.

25    Q    When you say him, who are you referring to?

1    A    The individual that we arrested, arrested for the

2    firearms violation.

3    Q    And who would that be?

4    A    Jonathan Clayland -- C-a-y-o-l his last name is

5    spelled.

6    Q    Okay, so when you say Mr. Clayland's brother, who are

7    you referring to?

8    A    Mr. Scott.

9    Q    And approximately how many ziplocs were in the blue

10   gym bag?

11   A    I believe over 200.

12   Q    And were they -- did they have anything inside of

13   them or were they empty?

14   A    They were empty, approximately half-inch by half-inch

15   ziplocs.

16              MS. GEORGE:  The Court's indulgence?

17   BY MS. GEORGE:  (Resuming)

18   Q    You indicated that there was a kitchen.  Were any

19   items recovered from the kitchen?

20   A    Yes, some more empty ziplocs.

21   Q    And could you please compare the size of the ziplocs

22   in the kitchen to the size of the ziplocs recovered from

23   the blue gym bag in the closet?

24   A    The same size, approximately half-inch by half-inch.

25   Q    And did those ziplocs have anything inside of them or

1    were they empty?

2    A    They were empty, Ma'am.

3    Q    Once you and the other officers were finished

4    searching the location, did the Defendant make any

5    statements in reference to securing his apartment on the

6    way out?

7    A    Yes.  He asked us to grab his keys and lock it up.

8    Also, the Defendant had a hard time breathing.  He asked

9    me if I could get his inhaler from the bedroom, at which

10   point I recovered a white inhaler from Bedroom 1 that the

11   Defendant stated was his.

12   Q    And did you give it to him?

13   A    Yes, I did.

14   Q    And in reference to the keys, did you take any action

15   as a result of his request to get the keys and lock up the

16   apartment?

17   A    Yes.  Officer Steen obtained the keys and she tried

18   both door locks, the lower and upper door locks, with the

19   keys and both of them had a key that locked either, locked

20   both --

21   Q    Did the officers -- I'm sorry, finish, please.

22   A    Locked both doors.

23   Q    Did Officer Steen tell you where she retrieved the

24   keys from?

25   A    I believe somewhere in the living room.

1          THE MAGISTRATE JUDGE:  Is that both doors you

2     said or did you mean both locks?

3          THE WITNESS:  Both locks, Ma'am, I'm sorry.

4     BY MS. GEORGE:  (Resuming)

5     Q    During the investigation of this case, did you

6     ascertain through the rental office whether or not the

7     Defendant lived in that apartment?

8     A    Yes, the Defendant and his brother both were on the

9     lease, that were staying in that apartment.

10    Q    And prior to the execution of the search warrant, did

11    you have an opportunity to obtain any information that

12    indicated that the Defendant lived at that location?

13    A    Yes.  While we were on scene, when his brother was

14    arrested, I asked his brother what address he lived at and

15    he stated that address.  I separately asked the Defendant,

16    Mr. Scott, if the brother lived with him, at which point

17    he did state that the brother lived with him at that

18    address.

19    Q    Now you said when you were on scene.  Was this on the

20    day of the search warrant or a prior day?

21    A    It was a prior day.

22    Q    Do you recall the date?

23    A    I believe it was March 30th, 2008.

24    Q    Okay.  And the search warrant that you were executing

25    on April 10th, 2008, was that search warrant in

1   relationship to the arrest of the Defendant's brother?

2   A    Yes, Ma'am.

3   Q    And do you recall the Defendant's brother's name?

4   A    Yes, Ma'am, Jonathan Caylon or Caylen.

5   Q    Officer Kasco, in the statement of facts that you

6   swore to in connection with the criminal complaint in this

7   case, you made a statement which indicated that the amount

8   of drugs in this case commonly indicates that they were

9   possessed with intent to distribute them, rather than sold

10  for personal use.

11       Could you please explain to the Court what about

12  the facts -- what circumstances and facts of this case

13  caused you to draw that conclusion?

14  A    The amount to include that amount of 183 grams,

15  approximately, the cutting of it on the ta -- I mean on

16  the plates for the packaging of that amount of empty

17  ziplocs, over 200, is commonly used for distribution.

18  Q    And when you say the cutting of it on the plate, did

19  you actually observe anyone cut anything?

20  A    No, Ma'am.

21  Q    So when you say that, what are you making reference

22  to?

23  A    Usually, in chunks like that, they're placed on a

24  plate and they're cut into, whatever amount needed to be

25  placed into the bags, to the ziplocs, to be sold.

1    Q    And based upon your experience, do you know what

2    price is associated with the half-inch by half-inch

3    ziplocs that were recovered in this case on the streets of

4    the District of Columbia?

5    A    Usually, $20.00 bags.

6         MS. GEORGE:  The Court's indulgence?

7    BY MS. GEORGE:  (Resuming)

8    Q    Did you or any other officers find any documents with

9    the Defendant's brother's name on it?

10   A    Yes.

11   Q    Did you find any documents in the apartment with

12   anyone else's name besides the Defendant and his brother?

13   A    No, Ma'am.

14        MS. GEORGE:  No further questions at this time,

15   Your Honor.

16        THE MAGISTRATE JUDGE:  Thank you, Ms. George.

17   Ms. Bosworth, you may cross examine.

18                    **CROSS EXAMINATION**

19   BY MS. BOSWORTH:

20   Q    Good afternoon, Officer.

21   A    Good afternoon, Ma'am.

22   Q    Officer, which reports did you complete in this case?

23   A    Excuse me?

24   Q    Which reports did you complete in this case?

25   A    The 163 and 168.

1    Q    Any others?

2    A    Without the actual paper work in front of me -- I

3    would have to look at all of the paper work, because I did

4    the connected paper work.

5    Q    I'm sorry, you did the connecting paper work?

6    A    When we process, we have connecting paper work,

7    DE-781.  I know that I did the 163 and 168, but in terms

8    of other paper work, I don't believe I did.

9    Q    Okay, did you take any notes in relation to this

10   case?

11   A    The only thing I would have completed would be Quick

12   Booking Form for the District, for 1D.

13   Q    And was there any radio communication in connection

14   with this case?

15   A    Yes.

16   Q    Did you use a recorded channel?

17   A    Yes.

18   Q    Do you know what that channel was?

19           MS. GEORGE:  Objection to relevancy to probable

20   cause.

21           THE MAGISTRATE JUDGE:  I assume this is part of a

22   Jencks inquiry.

23           MS. BOSWORTH:  That's correct, Your Honor.

24           MS. GEORGE:  Well, objection to _____.

25           THE MAGISTRATE JUDGE:  It's overruled.

1          MS. GEORGE:  (Inaudible.)

2          MS. BOSWORTH:  He said he did.

3          THE MAGISTRATE JUDGE:  The objection's overruled.

4    BY MS. BOSWORTH:  (Resuming)

5    Q    Do you remember what channel you used?

6    A    I believe we raised for Crime Scene, that may have

7    been 7D, and we also raised to have the board come to the

8    scene due to the fact that the Defendant stated that he

9    had a hard time breathing.

10   Q    And I take it you haven't testified before a grand

11   jury.

12   A    That is correct.

13         MS. BOSWORTH:  Your Honor, just for the record, I

14   have received the PD-163, the search warrant in the

15   Gerstein, as the Government stated.  In light of what the

16   officer testified about the additional documentation, I'm

17   prepared to proceed, but would request that we're provided

18   with that as soon as possible.

19         THE MAGISTRATE JUDGE:  Thank you, Ms. Bosworth.

20   Ms. George?

21         MS. GEORGE:  Your Honor, the officer indicated he

22   completed a PD-168, which is a list of the officers.

23   There's no substantially verbatim statement in reference

24   to his testimony or the incident on that document.  So the

25   Government contends that it's not Jencks, it would just be

1   discovery as to the names of the officers.

2          THE MAGISTRATE JUDGE:  And the transcript of the

3   communication?

4          MS. GEORGE:  The officer stated "we" raised on

5   the radio, he never stated on the record that he

6   specifically used the radio and made any communications.

7   I don't know whether he used the radio or some other

8   officer used the radio.  But if he used it and it meets

9   the definition of Jencks, the Government will turn it

10  over, as it normally does.

11         THE MAGISTRATE JUDGE:  Ms. Bosworth?

12         MS. BOSWORTH:  Well, Your Honor, if I could ask

13  him one question.

14         THE MAGISTRATE JUDGE:  You may.

15  BY MS. BOSWORTH:  (Resuming)

16  Q    Sir, did you speak on the radio in connection with

17  this case?

18  A    I don't recall, but I don't believe I did.

19  Q    You might have?

20  A    Yes, I'm not 100 percent sure.

21  Q    Thank you.

22         THE MAGISTRATE JUDGE:  Well, the Court will order

23  that the Government produce as Jencks material any

24  communication by Officer Kasco.

25         MS. GEORGE:  Certainly, Your Honor.

1    BY MS. BOSWORTH:   (Resuming)

2    Q    Now Officer, you went to the residence at 3411 A

3    Street based on a search warrant, correct?

4    A    Yes, Ma'am.

5    Q    And the search warrant had been obtained not for a

6    person, but for the residence, right?

7    A    Yes, Ma'am.

8    Q    And specifically, the search warrant was mainly

9    focused on finding firearms, correct?

10   A    Yes, Ma'am.

11   Q    And there was actually nothing specifically listing

12   drugs in that search warrant, correct?

13   A    That is correct.

14   Q    And when you got to the address of 3411 A Street, you

15   stated that you were with -- there were about 12 to 14

16   officers, correct?

17   A    That is correct.

18   Q    And this is about 3:00 o'clock p.m.?

19   A    In the afternoon, yes, Ma'am.

20   Q    And the officers were in uniform?

21   A    No, Ma'am, we were in plain clothes.

22   Q    And were you armed?

23        MS. GEORGE:   Objection on the relevancy as to

24   probable cause.

25        THE MAGISTRATE JUDGE:   Ms. Bosworth?

1          MS. BOSWORTH:  Your Honor, this is cross

2  examination I'm getting in, testing his memory and trying

3  to get a sense of what occurred on that day.  He testified

4  about all these events on direct.

5          THE MAGISTRATE JUDGE:  The objection is

6  sustained.

7  BY MS. BOSWORTH:  (Resuming)

8  Q   Now you stated on direct that you were actually part

9  of the entry team, correct?

10  A   That is correct.

11  Q   And you stated that someone executed a knock and

12  announce, correct?

13  A   That is correct.

14  Q   Can you explain what exactly happened during the

15  knock and announce?

16          MS. GEORGE:  Objection to relevancy to probable

17  cause.

18          MS. BOSWORTH:  Your Honor, she brought this out

19  on direct.

20          MS. GEORGE:  Your Honor, it's contextual

21  information that's going to open the door, it would be a

22  Fourth Amendment.

23          THE MAGISTRATE JUDGE:  The objection is

24  sustained.

25  BY MS. BOSWORTH:  (Resuming)

1    Q    Do you remember who knocked on the door?

2    A    My official.

3    Q    I'm sorry?

4    A    My official, my sergeant on the scene.

5    Q    And what was his name?

6    A    I'm sorry --

7              MS. GEORGE:  Objection to relevancy, Your Honor.

8              THE MAGISTRATE JUDGE:  Sustained.

9    BY MS. BOSWORTH:  (Resuming)

10   Q    And when your official knocked on the door, Mr.

11   Brinson-Scott answered, correct?

12   A    That is correct.

13   Q    And he opened the door without anybody having to

14   knock down the door?

15   A    That is correct.

16   Q    And when he opened the door, what happened?

17   A    He was detained and placed onto a chair.

18   Q    And when you say he was detained, do you mean that he

19   was put in handcuffs?

20   A    Yes.

21   Q    Okay.  And he was placed on a chair in the living

22   room?

23   A    Yes.

24   Q    And then you and the other officers proceeded to

25   search the apartment, is that correct?

1    A    That is correct.

2    Q    And first, you searched the -- where did you search

3    first?

4    A    We went to the bedroom first.

5    Q    To Bedroom Number 1?

6    A    Yes.

7    Q    Okay.  And you indicated on direct that at some

8    point, you asked Mr. Scott or somebody asked Mr. Scott

9    which room was his, correct?

10   A    That is correct.

11   Q    And you indicated that he made a movement with his

12   head, correct?

13   A    That is correct.

14   Q    And you indicated the movement with his head, he

15   pointed with his head indicated towards the left bedroom,

16   correct?

17   A    That is correct.

18   Q    And this is in response to your question, correct?

19   A    Excuse me?

20   Q    This was in response to him being asked a question,

21   correct?

22   A    I don't know the circumstances of what made him say

23   that.  I wasn't on -- I wasn't there when they asked him

24   that question, just in -- they reported to me the response

25   that he made.

1    Q    Okay, so you didn't actually see him nod his head

2    towards anywhere.

3    A    That is correct.

4    Q    Okay, but it's your understanding that they asked him

5    which room was his and in response, he nodded his head

6    towards the room on the left.

7    A    That is correct.

8    Q    Okay.  But you also indicated that at a later point,

9    he stated that he slept in the room on the right?

10    A    To those officers, correct.

11    Q    Okay.  Now did you, yourself, search Bedroom

12    Number 1?

13    A    Yes.

14    Q    And that's the room on the left, right?

15    A    Yes.

16    Q    Okay.  And you stated that when you went inside and

17    conducted the search, you recovered, you found some drugs

18    inside a black jacket, correct?

19    A    Actually, Officer Nasser's the one who actually found

20    the drugs and indicated to me.

21    Q    Okay, so one of the officers of your team found the

22    drugs inside a black jacket.

23    A    Yes, inside a black glove.

24    Q    Inside a black glove which was inside a black jacket.

25    A    Yes, Ma'am.

1    Q    And that black jacket was inside the closet?

2    A    Yes, Ma'am.

3    Q    Okay.  And also in that room, you indicated that some

4    documentation was found, correct?

5    A    Yes, Ma'am.

6    Q    Two pieces of documentation with Mr. Brinson-Scott's

7    name on it.

8    A    Yes, Ma'am.

9    Q    And you indicated that you didn't recover any other

10   mail matter, correct?

11   A    That is correct.

12   Q    Now you also indicated that you recovered some

13   contraband from the living room, correct?

14   A    That is correct.

15   Q    Specifically from underneath the seat of a chair?

16   A    That Mr. Scott was sitting on, yes, Ma'am.

17   Q    So an officer reached underneath the chair and found

18   the contraband?

19   A    It was checked briefly prior to Mr. -- for safety, to

20   make sure that it was clear of any type of weapons.  Then

21   a thorough search was done when we went back out into the

22   living room.

23   Q    Okay, and were the drugs found during the first brief

24   check?

25   A    No.

1    Q    So they were found during the more thorough check

2    later on.

3    A    Yes.

4    Q    Okay.  Now when you encountered Mr. Brinson-Scott, he

5    was the only person in the apartment, correct?

6    A    That is correct.

7    Q    And you first saw him in the living room and then he

8    was detained there for the remainder of the time, right?

9    A    Yes, Ma'am.

10   Q    So you never saw him in either of the bedrooms.

11   A    That is correct.

12   Q    And you never saw him sleeping in either of the

13   bedrooms.

14   A    That is correct.

15   Q    And I believe you indicated that you searched the

16   hallway closet and recovered some ziploc bags inside a

17   blue gym bag, correct?

18   A    That is correct.

19   Q    And then also, you recovered a photo of Mr. Brinson-

20   Scott and his brother?

21   A    That is correct.

22   Q    Was that inside the blue gym bag as well?

23   A    I believe it was just in the closet, in the hallway

24   closet.

25   Q    So it was not inside the gym bag.

1    A    I don't believe so.

2    Q    I believe you said that Mr. Brinson-Scott asked you

3    to get his keys and lock up the house, correct?

4    A    Yes, Ma'am.

5    Q    And he also asked you to get his inhaler.

6    A    Yes, Ma'am.

7    Q    Did he make any other statements during the duration

8    that you were there?

9    A    To me, no.

10   Q    What about to anybody else?

11   A    He did make those other gestures to other officers on

12   the scene.

13   Q    You mean -- you're referring to the head gestures?

14   A    That and to the other documentations, the D.C.

15   Superior Court, of that nature, I believe.

16   Q    I'm sorry, explain what --

17   A    As I stated earlier about the D.C. Superior Court

18   that was found in the living room, on a table, I believe

19   that was a conversation that may have been between him and

20   Officer Steen.

21   Q    Okay, any other statements other than that?

22   A    No, not to me.

23   Q    Okay.  Now Officer, you never saw Mr. Brinson-Scott

24   with any drugs in his possession, is that correct?

25   A    That is correct.

1   Q   And you didn't find any drug or paraphernalia on his

2   person, correct?

3   A   That is correct.

4   Q   And you know that there is at least one other person

5   who lives at the house other than Mr. Brinson-Scott,

6   correct?

7   A   That is correct.

8         MS. BOSWORTH:  Nothing further, Your Honor.

9         THE MAGISTRATE JUDGE:  Officer Kasco, in response

10   to Ms. George's question, one of Ms. George's questions,

11   you demonstrated a gesture that you said that Mr. Brinson-

12   Scott made.  Do you recall that?

13         THE WITNESS:  Yes, Ma'am.

14         THE MAGISTRATE JUDGE:  Now in response to Ms.

15   Bosworth's question, you said that you did not see Mr.

16   Brinson-Scott make a gesture.  Is that also your

17   testimony?

18         THE WITNESS:  Yes, Ma'am.

19         THE MAGISTRATE JUDGE:  On what basis, then, did

20   you demonstrate the gesture in response to Ms. George's

21   question if you didn't see it?

22         THE WITNESS:  That was related to me by the other

23   officers that were with Mr. Scott in the living room.

24         THE MAGISTRATE JUDGE:  Ms. George, do you have

25   redirect?

1      MS. GEORGE:  Quickly, Your Honor.

2                **REDIRECT EXAMINATION**

3   BY MS. GEORGE:  (Resuming)

4   Q    Officer Kasco, when you talked to those other

5   officers about the Defendant's gestures, did the officers

6   demonstrate what the Defendant did when they were telling

7   you what was occurring?

8   A    Yes, they basically stated that -- they said it and

9   they kind of demonstrated in the sense that he was tilting

10  his head to the left, then stated that he slept in the

11  bedroom to the right.

12            MS. GEORGE:  No further questions, Your Honor.

13            THE MAGISTRATE JUDGE:  What is "kind of

14  demonstrate" --

15            THE WITNESS:  Kind of --

16            THE MAGISTRATE JUDGE:  -- to use your words?

17            THE WITNESS:  In terms of like going like this.

18  I mean it's a demonstration, but I guess rather than

19  trying to say it, they also attempted to demonstrate it to

20  me, too.

21  BY MS. GEORGE:  (Resuming)

22  Q    What did you see the --

23            THE MAGISTRATE JUDGE:  Who is "they"?

24            MS. GEORGE:  Oh, I'm sorry.

25            THE MAGISTRATE JUDGE:  Who is "they"?

1           THE WITNESS:  I'm sorry, the two officers that

2     were handling prisoners' control were Officer Hayes,

3     Officer Beyers was out there and Officer Nasser was out

4     there.

5     BY MS. GEORGE:  (Resuming)

6     Q     And what --

7           MS. GEORGE:  I'm sorry, Your Honor, were you done

8     asking your questions?

9           THE MAGISTRATE JUDGE:  Yes.

10    BY MS. GEORGE:  (Resuming)

11    Q     Did all three of them demonstrate it or was there one

12    officer in that group that demonstrated it?

13    A     I couldn't tell you exactly what officer did it.

14    Q     Okay.  The person that you saw making the movement,

15    did they move their head as you demonstrated for the

16    Court?

17    A     Yes.

18          MS. GEORGE:  No further questions, Your Honor.

19          THE MAGISTRATE JUDGE:  Ms. Bosworth, do you wish

20    additional questions in view of the Court's questions?

21          MS. BOSWORTH:  No, Your Honor.

22          THE MAGISTRATE JUDGE:  Thank you, Officer Kasco,

23    you may step down.

24          THE WITNESS:  Thank you, Ma'am.

25          THE MAGISTRATE JUDGE:  Ms. George, does the

1    United States have other evidence?

2             MS. GEORGE:  No, Your Honor.

3             THE MAGISTRATE JUDGE:  Ms. Bosworth, is there

4    evidence you intend to offer with respect to probable

5    cause?

6             MS. BOSWORTH:  No, Your Honor.

7             THE MAGISTRATE JUDGE:  Do you wish argument on

8    probable cause or do you submit?

9             MS. BOSWORTH:  Your Honor, I'll briefly argue.

10   Your Honor, I would say that in this case, clearly,

11   there's more than one person who lives in this residence.

12    The search warrant was for the residence, it wasn't for a

13   particular person, and there were no drugs or

14   paraphernalia found on Mr. Brinson-Scott.  So I would say

15   that clearly, he and his brother and possibly more people

16   share all of the rooms in the house.

17            THE MAGISTRATE JUDGE:  Is it not also the case

18   that there were no controlled substances in plain view in

19   the room where Mr. Brinson-Scott was?

20            MS. BOSWORTH:  That's correct, Your Honor, I

21   don't believe there were any, was anything in plain view,

22   given that they were found inside the glove inside the

23   pocket of a jacket, inside a blue duffel.  And so I would

24   submit there's no probable cause, given that they didn't

25   find anything on my client and given that clearly, this is

1    a shared space and given that everything that was found

2    was actually the result of a thorough search, not just in

3    plain view.

4           THE MAGISTRATE JUDGE:  Ms. George?

5           MS. GEORGE:  With regard to defense counsel's

6    arguments and the Court's comment about the drugs not

7    being in plain view, the federal case law indicates that

8    if there's evidence that the defendant has dominion and

9    control over the residence, which there is evidence before

10   the Court of that, his name is on the lease.

11          He asked for very personal items that a person

12   would keep in the living space of a place that they reside

13   in, such as his keys and such as his inhaler.  The

14   officers did in fact take the keys and they do operate the

15   locks on the door of the apartment, so he certainly has

16   access to it.  He has certainly important documents inside

17   the residence, which indicates that he lives there, which

18   are his plea agreement from D.C. Youth Superior Court, a

19   Verizon cell phone bill, a certificate of title, a moving

20   violation.

21          In addition to that, the Defendant stated on

22   March 30th, 2008, that he in fact lived in the apartment

23   when Officer Kasco was arresting his brother and trying to

24   verify the address that his brother gave.  In addition to

25   that, the Defendant stated on the day of the search

1    warrant that he lived there.

2         So the Defendant is certainly connected to the

3    residence, resides in the residence and there's

4    documentation that indicates that he lives there.  So the

5    Government argues to the Court that the case that he has

6    knowledge of the items in the apartment, just like he knew

7    where his keys were, where his inhaler was, he knows where

8    -- he's given to know where the items are in the

9    apartment.

10        In addition to her comment about the space being

11   shared, I'm sure the Court is aware of the legal theory

12   called joint constructive possession.  So the fact that

13   someone else shares the living space does not totally

14   negate that the Defendant is in constructive possession of

15   the items in the residence that he has dominion and

16   control and access over.

17        So the Government would argue to the Court that

18   it has established probable cause, despite the fact that

19   the drugs were not in plain view or any other items

20   associated with the distribution of those drugs, including

21   the drug paraphernalia, which was also inside of a black

22   -- a blue gym bag.

23        So the Government establish -- argues to the

24   Court that it has established all of the elements of

25   possession with intent to distribute and constructive

1   possession at this time and asks that the Court find

2   probable cause.

3          THE MAGISTRATE JUDGE:  The Court, having

4   carefully considered the evidence and the reasonable

5   inferences to be drawn therefrom, finds that the

6   Government has failed to carry its burden and accordingly,

7   the Court is unable to find probable cause.  This matter

8   will be dismissed.

9          Mr. Brinson-Scott, please return with the

10  marshal, sir, you'll be released from the jail.  Ms.

11  Bosworth, you may be excused.

12          MS. BOSWORTH:  Thank you, Your Honor.

13          (Whereupon, the proceeding concluded.)

14

15

16

17

18

19

20

21

22

23

24

25

44

UNITED STATES OF AMERICA          )
                                  ) Docket No. 08-0255M-01
DISTRICT OF COLUMBIA              )


       I, PAUL R. CUTLER, do hereby certify that a recording of the foregoing proceedings in the above matter was duplicated from an original recording by the Office of the Clerk, United States District Court for the District of Columbia, and that said duplicate recording of the proceedings was transcribed under my direction to typewritten form.


__                                _____
                                         PAUL R. CUTLER

                              - - -


      I, DORIS A. CUTLER, do hereby certify that the foregoing transcript was typed by me and that said transcript is a true record of the recorded proceedings to the best of my ability.


__                                _____
                                         DORIS A. CUTLER